## Richmond.

## HUTZLER v. COMMONWEALTH.

### January 22, 1920.

1. INTOXICATING LIQUORS—*Instructions—Instructions not Supported by the Evidence—Aiding and Abetting.*—In a prosecution under the prohibition act, the trial court instructed the jury that they might find the accused guilty if he "knowingly aided, abetted, or assisted any other person or persons in doing such act or acts." It appeared from the testimony that if accused was guilty of any offense charged in the indictment, it was as a principal offender and not as an aider or abettor of some one else, therefore, the instruction was erroneous as being without evidence to support it.

2. INTOXICATING LIQUORS—*Instructions—Instructions not Supported by the Evidence—Aiding and Abetting.*—In a prosecution for violation of the prohibition law, an instruction that the accused might be found guilty if he aided or abetted another person in doing acts in violation of the law, was without evidence to support it and was not warranted because of an instruction given at the request of accused that if the jury believed that it was just as probable that some other person was guilty of the offense charged as that it was the accused, then it must acquit accused.

3. INTOXICATING LIQUORS—*Instructions—Possession of Another.*— In a prosecution for violation of the prohibition act, the court instructed the jury "that the possession of the ardent spirits by any person, upon the premises mentioned in the evidence, is a violation of law, punishable under this indictment." If the instruction had omitted the last clause, "punishable under this indictment," it would have correctly stated the abstract proposition of law intended to be embodied therein. But the insertion of the clause, "punishable under this indictment," might easily have misled the jury to the defendant's prejudice, where the jury had already been instructed that they might find the defendant guilty, although he did not commit the criminal acts himself, if he aided or assisted some one else in doing them.

Error to a judgment of the Hustings Court of city of Richmond.

*Reversed.*

The opinion states the case.

*L. O. Wendenburg,* for the plaintiff in error.

*Jno. R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile,* for the Commonwealth.

BURKS, J., delivered the opinion of the court.

The plaintiff in error, hereinafter called the defendant, was indicted for a violation of the prohibition law. There were several counts in the indictment, but the evidence for the Commonwealth all related to unlawfully storing intoxicating liquors, which was sufficiently charged in the indictment. There was a verdict and judgment against the defendant, and to that judgment this writ of error was awarded.

The errors assigned are the refusal of the trial court to grant the defendant a continuance, granting improper instructions for the Commonwealth, improperly amending an instruction offered by the defendant over his objection, and the refusal of the trial court to set aside the verdict as contrary to the law and the evidence. We shall deal with the ruling on the instructions first.

[1] The offense charged was a misdemeanor, and the objection made to two of the instructions tendered by the Commonwealth and to the amendment of one of the instructions tendered by the defendant was substantially the same. One of these instructions told the jury that although the defendant may not have done any one or more of the acts

charged in the indictment, they might find him guilty if he "knowingly aided, abetted or assisted any other person' or persons in doing such act or acts," and this principle was involved in each of the other instructions. The specific objection to the ruling of the trial court is that there was no evidence in the cause to support the ruling. We are of opinion that the objection was well taken.

The offense which the Commonwealth sought by its evidence to establish against the defendant was the unlawful storing of intoxicating liquors. The liquor was found in a small room adjoining the property which had been leased to a Mr. Asher, who conducted an ice business there. He was about to leave the city on Saturday afternoon, May 11, 1918, to be absent until the following Sunday afternoon, and requested the defendant to go to the premises in question and feed and water his horses Saturday night and Sunday morning, and gave him the office key so that he could enter the premises. These facts are not controverted. What transpired thereafter, and the relative location of the buildings on the property, will more fully appear from the following testimony offered by the Commonwealth and defendant, respectively, which is given in the record in narrative form:

"W. H. Witzgall testified on behalf of the Commonwealth that he and Brennan were officers of the city of Richmond, Virginia; that they were sitting in the door of the office of the property that was formerly occupied by the Robert Portner Brewing Company on Kenney street, between Broad street and the railroad, about nine o'clock p. m. on May 11th, which was a Saturday; that the accused came up to them, and said he was sorry to bother them and unlocked the office door with a key and went inside the office; thereupon the witness who was waiting for a train to come in to see if anyone got off with intoxicating liquor, went up towards the railroad on the northern side of the

property, along which the railroad track ran.   That on
the northern side of this property the offices were built,
and then east of the offices there was a platform covered
over with a roof, which platform was about fifteen feet
wide, and on the east side of this platform there was a
large room built for storing ice, and adjoining this was
another smaller room.   The northern side of this platform
abutting on the railroad track was closed in by sliding
doors or gate; there was a box car in front of this platform,
which came within about six inches of the platform; the
southern side of this platform was closed in by a parti-
tion through which there was a door, south of this there
was another partition, through which there was another
door leading on to another platform that abutted upon the
paved court or yard of this property; that on the Broad
street side, or south side of this property, there was a
stable.   The witness said he crawled under the platform
that abutted against the car and found a part of one of
the boards broken out near the northwestern corner of the
platform; that it was very dark, and in a short while he
heard a man walk on the platform, and saw him go to
the room next to the ice box and go into this room and
bring out something under his arm; that he felt sure that
this was the accused, though he admitted that it was very
dark and there was no light there; that he went then over·
to the southern door towards the southern platform of
the yard; that he got out on the platform and found the
door to the room next to the ice box locked; thereupon, he
swore out a search warrant for the premises and had the
place searched, and found in this room a funnel, an empty
·keg and a number of quart bottles of whiskey in car*toons*
and a number of car*toons*, thereupon, later on in the night,
he arrested the accused.

"W. E. Brennan testified that when he and officer Witz-
gall got up out of this doorway to allow the accused to

enter same he went towards Broad street and got over in the college grounds; that while. he was in the college grounds the accused came out of the building and walked up and down the south side of Broad street several times in front of the building, and then disappeared; that in about twenty minutes he saw an automobile drive into the yard of the property of the Robert Portner Brewing Company and remain in there about five minutes, and then come out and go down the street.

"Mr Asher testified in behalf of the defendant that he was engaged in the ice business in the city of Richmond, Virginia, and rented the property mentioned by Mr. Bowe; that there were two ways of entering the premises, one through the large gates, the other through the office. That he and a lot of his friends were to spend an all day picnic in the country the next day with their families; that a number of the men were to go down the evening before; that he desired to do this, and asked his friend, the defendant, to go up Saturday night and feed his horses which he kept on said premises, also to feed them the next Sunday morning, and gave him the key to the office so that he could enter the premises; that the witness joined his friends that Saturday afternoon out in the country in Chesterfield county and remained there until Sunday afternoon; that he had nothing to do with the room next to the ice box, and knew nothing about any liquor therein.

"The defendant testified in his own behalf that Mr. Asher asked him on Saturday afternoon to feed his horses Saturday night and Sunday morning on said premises, and gave him the office key so that he could enter said premises; he agreed to look after the horses and then join the party out in the country the next morning; that at the time mentioned by the officers above he went to the office door of said premises, and found officers Witzgall and Brennan sitting on the door step; that it was then very dark, and he

stated to these officers that he was very sorry to have to dis-
turb them as he wanted to go in; they got up, and he un-
locked the office door and went in through the office out on
the platform that is on the inside of the premises abutting
the yard, and went from there over to the stable; that this
was the way he was told to enter the premises; that he
fed the horses and turned the water into a large water
box which is about four feet by eight feet and takes a
very long time to run full; he asked these officers what
they were doing there, and they said they were waiting
for an incoming train to see if any bootleggers got off
at that point; that while in the stable attending to the
horses he heard an automobile drive into the yard and stop
over at the platform that abutted on the yard; that he
could not see who the party was nor what he did; that
he remained there at that platform, which connected with
the platform under which officer Witzgall said he was hid-
ing, and that after remaining there a few minutes the
car left. That after getting through feeding and watering
the horses and fixing their bedding, he came out, the same
way he entered, and some time later on that night was
arrested; that he knew nothing about the liquor that was
found on said premises, and had no knowledge of there
being any liquor on the premises; that when he came
through the office he had to step down on the platform
under which officer Witzgall was hiding, and that it was
an impossibility for any one to recognize another person
while on that platform which was really a closed room
without any windows, even though such persons was stand-
ing immediately in front of him; that it was so dark he
stumbled and came near falling because he could not see
where he was stepping."

It will be observed that the only evidence which con-
nects the defendant with the offense charged is the testi-
mony of policeman Witzgall, "that it was very dark and

105

in a short while he heard a man walk on the platform, and saw him go to the room next to the ice box and go into the room and bring out something under his arm; that he felt sure this was the accused, though he admitted it was very dark and there was no light there." If, in view of the testimony of this witness and that of the defendant as to visibility, this can be called an identification of the defendant, and if he was guilty of any offense charged in the indictment, it was as a principal offender and not as an aider or abettor of some one else. There is no evidence that the man in the automobile ever entered the building, or if we assume the possibility or the probability that he did enter it and deposit the liquor there, there is a total lack of evidence to show that the defendant did aid or abet him in storing it there, or had any connection whatever with him or his doings. Indeed, in the brief filed on behalf of the Commonwealth, it is said that "the only conclusion that can be drawn from the evidence is that the ardent spirits found were in the possession of and stored by the petitioner, who had the key that unlocked the room in which they were stored. This conclusion is irresistible from the testimony of the witnesses and the circumstances which connect the accused with the crime charged in the indictment." It thus appears that the representative of the Commonwealth disavows any claim that the defendant "knowingly aided, abetted or assisted any other person or persons" in storing the liquor, and we are unable to find in the record any evidence to support the idea that the defendant did aid or abet any one else in storing it. This theory of the Commonwealth in the trial court was without evidence to support it, and it was error to have embraced it in the instructions given to the jury.

[2] It was argued here that the instructions were warranted because the counter-theory was presented by in-

struction 4 given for the defendant. That instruction, as tendered by the defendant, was as follows:

"The court instructs the jury that if you believe from the evidence that it is just as probable that some other person was guilty of the offense charged as that it was the accused, then you must acquit him even though you may believe from the evidence that the probabilities of his guilt are greater than the probabilities of his innocence."

We see nothing in the instruction to warrant the conclusion drawn therefrom. It amounted to nothing more than telling the jury they could not convict the defendant on a preponderance of probabilities of his guilt, and was such an instruction as might have been given in any criminal case. It did not warrant the giving of instructions on the subject of aiders and abettors in the absence of any evidence on the subject of aiding and abetting.

[3] Instruction No. 2, granted for the Commonwealth, was as follows:

"No 2. The court further instructs the jury that the possession of the ardent spirits, by any person, upon the premises mentioned in the evidence, is a violation of law, punishable under this indictment."

This instruction was clearly misleading, if not erroneous. It was evidently framed under section 17 of the act of 1918, (chapter 388), declaring that "it shall be unlawful to deliver to, receive in, keep, store * * or have in possession ardent spirits in any place, except as provided in this act," and that "any violation of this section shall be a misdemeanor." If the instruction had omitted the last clause, "punishable under this indictment," it would have correctly stated the abstract proposition of law intended to be embodied therein, and would have brought to the attention of the jury the offense created by that section. It would then have been the province of the jury to have applied the instruction to the evidence before them and

have determined whether or not the evidence showed a violation of the statute by the defendant. But the insertion of the clause, "punishable under this indictment," might easily have misled the jury to the defendant's prejudice. While instructions are to be read in the light of the evidence and applied to the case under trial, and such reading may supply a specific application of general language used in an instruction, it cannot cure erroneous or misleading statements of the law which do, or may, operate to the prejudice of one accused of crime. The jury had already been told by instruction No. 1, that they might find the defendant guilty, although he did not commit the criminal acts himself, if he aided or assisted some one else in doing them. This was a correct statement of the law, though it was probably new to some of the jury. Then follow instructions telling them, without qualification or explanation, that the possession of ardent spirits, by any person, upon the premises, is a violation of law, "punishable under this indictment," in other words, for which they may also find him guilty. The instruction was seriously prejudicial to the defendant, and, for the error in granting it, the judgment of the trial court must be reversed.

As the case has to be remanded for a new trial, it is unnecessary to pass on the ruling of the trial court on the defendant's motion for a continuance, or the sufficiency of the evidence to support the verdict, which may be different on another trial.

*Reversed.*